## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: | |
| IN RE NICHOLS BROTHERS, INC., et al.,[1] | Case No. 18-11123-M<br>Chapter 11 |
| Debtors. | Jointly Administered |

### AMENDED MOTION TO SETTLE AND COMPROMISE CLAIMS BY AND AGAINST THE RAILROAD COMMISSION OF TEXAS AND NOTICE OF OPPORTUNITY FOR HEARING

W.O. Operating Company, Ltd. ("WO" or "Debtor"), by and through counsel, hereby requests that the Court approve a compromise and settlement with the Railroad Commission of Texas ("RRC") and SB Energy I, LLC ("Buyer") and Large Operating, LLC ("Operator"). As support therefore, the Debtor will show the Court the following:

### Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 11 U.S.C. § 157(b)(2)(A) and (B).

### Background

2. On June 1, 2018, the Debtor commenced a voluntary petition under Chapter 11 of the United States Bankruptcy Code. The Debtor's case was administratively consolidated under Case No. 19-11123-M of Nichols Brothers, Inc. Prior to filing, the Debtor was part of a diversified group focusing primarily on oil and gas operations. The Debtor's principal assets are located in the

---

[1] The Debtors in these jointly administered cases are: NICHOLS BROTHERS, INC., Case No. 18-11123-TLM; NBI PROPERTIES, INC., Case No. 18-11124-M; NBI SERVICES, INC., Case No. 18-11125-M; LADDER COMPANIES, INC., Case No. 18-11126-M; RED WATER RESOURCES, INC., Case No. 18-11127-M; CANO PETRO OF NEW MEXICO, INC., Case No. 18-11128-M; and W.O. OPERATING COMPANY, LTD., Case No. 18-11129-M.

panhandle of Texas and comprise of approximately 73 oil and gas leases with approximately 900 wells located thereon. The Debtor has not operated for some time based, in part, upon severance orders issued by the RRC.

3. Upon filing, the RRC took various actions in the Debtor's case, including but not limited to filing a motion to convert the Debtor's Chapter 11 case to one under Chapter 7, seeking to transfer the Debtor's case to the Northern District of Texas, and commencing an adversary action [Adv. No. 18-1041-M] asserting certain claims and relief against the Debtor. In the adversary complaint, the RRC is seeking, among other things, to establish claims against the Debtor.

4. The Debtor has vigorously defended against the actions of the RRC, including filing a motion to dismiss the adversary complaint, which is presently pending before the Court. The adversary case raises novel and difficult issues concerning the claims brought by the RRC against the Debtor. The Debtor sought the opportunity to sell its oil and gas properties to a third party.

5. On October 19, 2018, the Debtor entered into an asset purchase agreement ("APA"), as amended, with SB Energy 1, LLC ("SB Energy"), which provided for a sale of substantially all of its assets, including the 73 oil and gas leases and associated wells located thereon.

6. On November 26, 2018, the Bankruptcy Court entered an *Order Approving Sale of Assets Outside of the Ordinary Course of Business, Free and Clear of Liens, Claims, and Encumbrances, and Approving Entry into and Consummation of Asset Purchase Agreement, all Pursuant to 11 U.S.C. § 363* [ECF No. 230] (the "Sale Order"). The Sale Order and APA incorporated the terms of the compromise among the Parties.

7. Debtor filed a Motion to Settle or Compromise on November 6, 2018 [ECF No. 216] which would have settled all matters between Debtor and the RRC. No objection has been interposed to the original Motion to Settle or Compromise [EFC No. 216]. That Motion to Settle

2

[EFC No. 216] is now amended and replaced by this Motion, based upon the following changed circumstances.

8. On November 30, 2018, Buyer unilaterally notified WO and the RRC that it would not acquire the Fee -244- Lease, lease number 10-00106 ("Fee Lease"), and thus the Operator (as defined in the Amended Term Sheet) would not place the associated wells on its operator's bonds with the RRC. If the matter closes, subject to Buyer's unilateral election. A result of this action is that WO will continue to own 122 unplugged wells on the Fee Lease, which represent approximately 13% of WO's initial 917 wells and reflects an estimated plugging liability of $2.6 million which will not be assumed by Buyer or Operator, as originally agreed. This materially affects the total compromise and resolution of issues related to the removal of the obligations to plug and abandon these wells, which were resolved in the APA. In turn, the claim within the RRC's Adversary Proceeding (18-01041) seeking for Debtor to plug the inactive wells is no longer moot as to the 122 wells on the Fee Lease, but remain moot as to the other leases covered in the APA.

9. The result of the Buyer's action is to leave the matters related to the Fee Lease (involving 122 wells) unresolved. Debtor has conducted a careful review of this matter given the action taken by Buyer. The action taken puts the transaction of the APA at risk and delayed the Closing. The financial consideration paid to WO under the APA is not affected, but the estate is left with a financial exposure of $2.6 million which was to have been assumed by Buyer and/or Operator. WO has determined that these actions taken by Buyer constitute a breach of the APA agreement and has exercised its business judgment in determining whether to declare a breach and recover the $100,000 deposit, or to go forward with the Closing of the APA and affected removal of the Fee Lease. Given the time committed to reach resolution as represented by the APA and the regulatory approval, and the fact (i) that the cash consideration of $1 million to be paid is not reduced and is a significant sum, (ii) that approximately 795 wells will be transferred, (iii) that the

3

oil in tank batteries will be sold for WO by Buyer, and (iv) that additional consideration could arise under the APA for earnout if other leases are operated by Buyer, Debtor has determined that it will waive the breach by Buyer, at Closing, provided that Buyer does not breach any other provisions of the APA.

10. For the foregoing reasons, WO will waive the breach such that Buyer can close notwithstanding the fact that Buyer is not assuming the Fee Lease, provided that (i) WO enters into the Amended Term Sheet with SB Energy and the RRC, a copy of which is appended hereto as Exhibit "A," (ii) the Bankruptcy Court approves this Motion, and (iii) Buyer does not commit another breach of the APA through Closing.

11. Further, the RRC suggested, and the Buyer accepted, other material changes to the Term Sheet, namely provisions stating that (i) if Buyer or its designated operator, Large Operating LLC, obtains the Fee Lease within five (5) years of closing, Buyer agrees to assume all plugging and environmental liabilities associated with the Fee Lease; (ii) Buyer will not further amend the deal; and (iii) will comply with the other terms of the APA.

12. Because 122 wells would remain with WO, the RRC cannot dismiss its Adversary Proceeding, as originally agreed as to the 122 retained by WO. In the event WO cannot find a buyer for the Fee Lease, WO believes that it is in its best interest that the bankruptcy case be dismissed after Closing of the APA transaction. The pending litigation in the Adversary action raises legal issues which are arguably not settled law in the Tenth Circuit and which the RRC has advised it would be required to litigate. WO will have disposed of most of its assets, and will have little or no unencumbered assets, and cannot afford the cost of litigation.

13. As part of the sale, both the Debtor and representatives of SB Energy negotiated with the RRC concerning regulatory approval of the sale. As part of these negotiations, the Debtor and RRC settled and resolved all claims against the other.

**Settlement Terms**

14. The terms and conditions to which the Debtor and RRC have agreed to settle and compromise various claims as between the parties, and which approval is being sought by the Court, are set forth in the Amended Term Sheet attached as Exhibit "A." The material terms of the settlement and compromise are as follows:

(1) Upon Closing of the APA, WO will be released from liability in connection with all leases transferred to Buyer.

(2) The RRC will have an allowed general unsecured claim against the Debtor's estate in the amount of $10,208.35 for all pre-petition obligations owed to the RRC that are not in the nature of fines and penalties;

(3) The RRC will have an allowed unsecured claim against the Debtor's estate in the amount of $4,130,392 for all pre-petition fines and penalties owed to the RRC, which the RRC will agree to subordinate pursuant to the policy rationale of 11 U.S.C. § 726(a)(4);

(4) Within 60 days of Closing, W.O. Operating will dismiss its bankruptcy case unless prior to the dismissal date, Debtor files a §363 motion to sell the Fee Lease. Dismissal will be stayed pending a hearing on a motion to sell the Fee Lease, but should occur no later than May 1, 2019 unless otherwise agreed to in writing. Within five days of the dismissal of the bankruptcy of W.O. Operating, the Railroad Commission shall dismiss the Adversary Proceeding No. 18-1041-M filed against the Debtor by the RRC, without prejudice;

(5) Adversary Proceeding No. 18-1041-M filed against Debtor by the RRC will be dismissed in the event WO accomplishes a sale of the Fee Lease, as provided in paragraph 4 above.

**Discussion**

15. Federal Rule of Bankruptcy Procedure 9019 authorizes courts to approve settlements that affect the bankruptcy estate. The approval or rejection of a settlement is left to the sound discretion of the court and is determined by the particular facts and circumstances of the proposed settlement. The phrase "sound discretion" denotes the absence of any hard and fast rule; indeed, it contemplates a decision giving due regard to what is right and equitable under the

5

particular circumstances and applicable law. *See generally Protective Committee for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).

16. Courts have adopted the following criteria to determine the acceptability of a proposed settlement under Bankruptcy Rule 9019:

> (1) The balance between the likelihood of success compared to the present and future benefits offered by settlement;
>
> (2) The prospect of complex and protracted litigation if settlement is not approved;
>
> (3) The expense, inconvenience, and delay necessary in attending the litigation (including the possibility that denial of settlement will cause depletion of assets);
>
> (4) The competency and experience of counsel who support settlement;
>
> (5) Other factors relevant to a full and fair assessment of the wisdom of the proposed settlement;
>
> (6) The extent to which settlement is the product of arms' length negotiation; and
>
> (7) The paramount consideration of creditors and other parties-in-interest, which requires whether the proposed settlement falls below the lowest point in a range of reasonableness.

*See generally American Employers' Ins. Co. v. King Resources Co.*, 556 F.2d 471 (10th Cir. 1977); *see also In re Kopexa Realty Venture Co.,* 213 B.R. 1020 (10th Cir. BAP 1997). The Debtor respectfully submits that the above-referenced settlement and compromise is fair and equitable and in the best interest of Debtor, its creditors, and parties-in-interest.

17. The Debtor submits that the terms of the proposed settlements meet the requirements established for Rule 9019. The settlement will avoid costly and protracted litigation and will free funds to pay expenses and creditors, and the agreement of the RRC to permit WO to sell its assets, is expressly conditioned on these terms and the Amended Term Sheet.

**NOTICE OF OPPORTUNITY FOR HEARING**

**Your rights may be affected. You should read this document carefully and consult your attorney about your rights and the effect of this document.** If you do not want the Court to grant the requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Northern District of Oklahoma, 224 South Boulder, Tulsa, Oklahoma 74103 no later than 24 days from the date of filing of this request for relief. You should also serve a file-stamped copy of your response or objection on the undersigned movants' attorneys, and any party who is required to be served under applicable law, and file a certificate of service with the Court. If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice. **The 24-day period includes the three (3) days allowed for mailing provided for in Bankruptcy Rule 9006(f).**

WHEREFORE, the Debtor, the RRC, Buyer, and the Operator request that the Court approve the above-referenced settlement between the parties pursuant to Federal Rule of Bankruptcy Procedure 9019, that the order be deemed final upon entry, and any other relief that the Court deems reasonable and just under the facts of this bankruptcy case.

Respectfully submitted,

*/s/ Chad J. Kutmas*
Gary M. McDonald, OBA No. 5960
Chad J. Kutmas, OBA No. 19505
Mary E. Kindelt, OBA No. 21728
MCDONALD & METCALF, LLP
First Place Tower
15 E. Fifth Street, Suite 1400
Tulsa, OK 74103
(918) 430-3700
(918) 430-3770 (Fax)

*Attorneys for the Debtor*

*Execution Version*

# EXHIBIT A

*— Matter of Nichols Brothers, Inc, et al. —*
AMENDED SETTLEMENT AGREEMENT TERM SHEET

This Amended Term Sheet is being entered into between W.O. Operating Company, Ltd. ("W.O. Operating"), SB Energy 1, LLC, or its assignee ("Buyer"), Large Operating, LLC, (the "Operator"), and the Railroad Commission of Texas ("Commission" and collectively with W.O. Operating, Buyer, and Operator, the "Parties").

This Amended Term Sheet summarizes the principal terms and material conditions of a proposed settlement of the claims and disputes currently pending between W.O. Operating and the Commission in connection with W.O. Operating's Chapter 11 bankruptcy case, which is being jointly administered in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Bankruptcy Court") under the caption of *In re Nichols Brothers, Inc., et al.*, No. 18-11123-M ("Chapter 11 Case").

In connection with the Chapter 11 Case, W.O. Operating seeks to sell substantially all of its assets. On November 26, the Bankruptcy Court entered the *Order Approving Sale of Assets Outside of the Ordinary Course of Business, Free and Clear of Liens, Claims, and Encumbrances, and Approving Entry into and Consummation of Asset Purchase Agreement, all Pursuant to 11 U.S.C. § 363* [ECF 230] (the "Sale Order") that authorizes the Debtor to sell substantially all of its assets to Buyer.

In connection with the preparations for the closing of the sale, Buyer notified W.O. Operating and the Commission that Buyer cannot provide Commission the Good Faith Claim Affidavit (defined below) with respect to one (1) lease identified as "Fee -244-", lease number 10-00106 (the "Fee Lease"), and the Operator (defined below) will not place the associated wells on its bonds with the Commission, and as such the Buyer would not be able to satisfy the conditions to closing under the Asset Purchase Agreement ("APA") approved by the Sale Order. W.O. Operating confirmed to Buyer that it will waive conditions to closing such that Buyer can close notwithstanding that Buyer is not assuming the Fee Lease, provided that (i) W.O. Operating enters into an Amended Term Sheet with the Buyer and the Commission, (ii) the Bankruptcy Court approves the Rule 9019 Motion to Settle and Compromise, described herein, (iii) the Commission approves the Amended Term Sheet, and (iv) Buyer closes the APA approved by the Sale Order in full compliance with all other terms and conditions of the APA between W.O. Operating and Buyer, as approved by the Bankruptcy Court.

This Amended Term Sheet also summarizes the principal terms and conditions required of Buyer and Operator to operate the assets it is buying from W.O. Operating. Buyer has established a new Commission-approved operator in connection with its agreements with the Commission which is the Operator.

This Amended Term Sheet is provided to memorialize the settlements and/or agreements reached between the Parties on October 19, 2018, with subsequent negotiations, and as modified following the entry of the Sale Order.

W.O. Operating filed a Motion to Settle or Compromise on November 6, 2018. Before the Court entered an Order on the unopposed motion, Buyer notified the other Parties that the Operator will not place the wells associated with the Fee Lease on its bond with the Commission, which triggered modifications to the original Term Sheet. The Parties still desire to close the APA with the removal of the Fee Lease as quickly as possible.

By signing this Amended Term Sheet, Buyer affirms that it will submit satisfactory paperwork, described below, to transfer the wells associated with W.O. Operating's remaining 72 leases and will not exclude other leases from the APA.

Execution of this Term Sheet shall be binding on the Parties subject to approval by the Court pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

### I.     Agreements Between W.O. Operating and Buyer

1.1   W.O. Operating filed the Sale Motion seeking to sell substantially all its assets under the terms of APA. As noted above, the W.O. Operating confirmed to Buyer that if Buyer fully complies with all other terms, provisions, and conditions of the APA that it will waive conditions to closing related to the Fee Lease such that Buyer can close notwithstanding that Buyer is not assuming the Fee Lease provided, that among other things, the Bankruptcy Court approves this Amended Term Sheet and approves a Rule 9019 Motion to Settle and Compromise as hereinafter described.

### II.    Agreements Between Buyer and the Commission

2.1   As part of the purchase, and as a condition of the Commission's approval of the same, Buyer and Commission will take the following actions prior to the closing of the sale under the APA:

- a. Operator will obtain financial assurance to secure a Form P-5 Organization Report ("Form P-5") in the amount of $250,000 pursuant to 16 Texas Administrative Code § 3.78.

- b. Richard Sands will be listed as an officer or director on the Operator's Form P-5 on file with the Commission, unless and until the Commission consents in writing to any changes to the Form P-5.

- c. Buyer or Operator shall submit a dual-signature form P-4 Producer's Transportation Authority and Certificate of Compliance ("Form P-4") transfer of operator form for each of the 72 leases (the "Leases") being sold by W.O. Operating to Buyer under the APA in the name of the Operator. Buyer or Operator shall submit the P-4 Transfer packets at least five days before the closing of the sale under the APA.

- d. Given the unique facts and circumstances in this case, as part of the dual signature P-4 transfer packets, the Commission shall accept the Operator's

affidavit as evidence of a "good-faith claim" to title, a copy of the proposed affidavit language is attached as Exhibit A (the "<u>Good Faith Claim Affidavit</u>"). The Commission is not challenging the validity of the Leases. In the event that some third-party with standing desires to contest the "good-faith claim" to title, the Commission shall open a docket to be presided over by an Administrative Law Judge with the Commission's Hearings Division and the Operator will be required to supplement the evidence beyond the Good Faith Claim Affidavit to prove a good-faith claim to operate the Leases.

e. Buyer/Operator agrees that it shall not submit a Form P-4 to change the operator for any of the Leases for a period of 18 months after the closing date of the APA ("<u>Closing</u>").

f. Buyer and/or Operator must comply with all rules and regulations of the Commission. Buyer and/or Operator will remedy any existing severance issues within all applicable time periods as may be extended in writing by the Commission. The Commission will provide extensions with respect to any H-15 severance issues upon the approval of a reasonable submitted plan which identifies the course of action the Operator will take to bring the wells into compliance regarding any H-15 severance issues (the "<u>Work Plan</u>"). The Operator may seek subsequent extensions of the compliance deadlines upon a showing of the progress made under the previously approved Work Plan, such extensions not to be unreasonably withheld. A failure to timely request the extension, via email or in writing, shall result in severance fees for all outstanding wells not in compliance. Buyer and/or Operator will have six months following Closing to comply with W3-C surface requirements. The terms set forth in Exhibit B attached hereto have been included in the Sale Order.

g. The Commission will not assert the penalties addressed in Section III, 3.1(a)-(b) ("<u>Pre-Closing Claims</u>") against Operator. Those penalties represent the outstanding balance of the penalties assessed against W.O. Operating for false-filing violations and estimated penalties under 16 Texas Administrative Code sec. 3.14(b)(2) for failure to plug inactive wells. The Buyer/Operator acknowledges that, notwithstanding this provision, it must comply with all applicable rules, regulations, and statutes after Closing, including, but not limited to, fines or penalties assessed after Closing.

h. As a condition to Closing, Buyer/Operator will obtain a Commission-approved bond or letter of credit (the "<u>Additional Financial Assurance</u>"), in the amount of $2,000,000 consistent with Rule 3.15(f)(2)(B)(iii); however, this Additional Financial Assurance cannot be a cash deposit. Absent written consent of the Commission, the Operator shall maintain the Additional Financial Assurance in place for two years following the Closing. After the two-year period, Buyer/Operator shall be able to remove the Additional

3

    Financial Assurance absent Commission consent so long as Buyer/Operator satisfies the applicable rules and regulations that do not require the Additional Financial Assurance. The Operator may continue the plugging extension for all inactive wells so long as the Additional Financial Assurance remains in force and effect and the Operator remains in compliance with applicable laws and regulations; the Parties acknowledge that the effectiveness of this Term Sheet is conditioned upon Buyer/Operator obtaining a Form P-5, obtaining $250,000 in financial assurance, transferring the 72 dual signature Form P-4 transfers, and maintaining the Additional Financial Assurance as set forth herein.

    i. If the Operator or a related entity obtains a lease on the Fee Lease within five years from the date of closing, Operator agrees to assume all plugging and environmental liability associated with the Fee Lease.

 2.2 This amended agreement will be incorporated into a separate amended Agreed Order among W.O. Operating, Buyer, Operator, and the Commission to be submitted for Commissioner approval at a regularly scheduled Open Meeting. The Commissioners already approved an Agreed Order respecting the original deal; therefore, Commissioner approval of an amended Agreed Order is not a condition precedent for the deal to close.

  **III.** **Agreements Between W.O. Operating and the Commission**

 3.1 In the event that (i) the Bankruptcy Court approves a Rule 9019 Motion to Settle and Compromise claims between the Commission and WO Operating, including the following terms, and (ii) Buyer meets each of the obligations required by the Commission under this Term Sheet, W.O. Operating and the Commission will settle and resolve all disputes between them as follows:

    a. The Commission will have an allowed general unsecured claim in the amount of $10,208.35 for all pre-petition obligations owed to the Commission that are not in the nature of fines and penalties, but which will have no force and effect in the event of dismissal of the bankruptcy and W.O. Operating and the Commission shall be free to litigate the issue in a state court or administrative proceeding of competent jurisdiction;

    b. The Commission will have an allowed unsecured claim in the amount of $4,130,392 for all pre-petition fines and penalties owed to the Commission, which the Commission will agree to subordinate pursuant to the policy rationale of § 726(a)(4) of the Bankruptcy Code, but which will have no force and effect in the event of dismissal of the bankruptcy and W.O. Operating and the Commission shall be free to litigate the issue in a state court or administrative proceeding of competent jurisdiction; and,

    c. Within 60 days of Closing W.O. Operating will dismiss its bankruptcy case, unless prior to the dismissal date, Debtor files a §363 motion to sell the Fee

4

Lease. Dismissal will be stayed pending a hearing on a motion to sell the Fee Lease, but should occur no later than May 1, 2019 unless otherwise agreed to in writing by the Commission. Within five days of the dismissal of the bankruptcy of W.O. Operating, the Railroad Commission shall dismiss the Adversary Proceeding No. 18-1041-M filed against W.O. Operating by the Commission, without prejudice.

  3.2 This agreement between W.O. Operating and the Commission will be incorporated into a Rule 9019 Motion to settle and compromise ("Rule 9019 Motion") and will be subject to approval by the Court in the Chapter 11 Case.

### Closing

The Parties shall coordinate the Closing of the APA Sale to occur at the same time as the approval of the transfer of the 72 dual-signature Form P-4s by the Commission. At least 5 days before closing, the Operator will have (i) obtained approval by the Commission as an operator with a valid P-5 Organization Report, (ii) provided the Commission copies of the P-4 transfer packets, and (iii) provided the Commission the $2,000,000 Additional Financial Assurance. The Commission will notify the Parties of any deficiencies no less than 48 hours in advance of the scheduled Closing. If Buyer or Operator do not submit satisfactory paperwork for the transfer of the 72 Leases, the Closing will not occur as scheduled until all such deficiencies are corrected. Closing of the transaction shall occur no later than 10 days from the entry of the order of the Bankruptcy Court approving the Rule 9019 Motion.

W.O. Operating shall file a notice with the Court upon closing of the Sale.

### Miscellaneous

Notwithstanding any other provision of this agreement, the settlement terms set forth herein shall be deemed the Settlement Agreement among the Parties with respect to the subject matters contained herein, and the same terms will be reflected in an Agreed Order in form and substance suitable for presentation to the Commissioners of the Railroad Commission of Texas for approval. Nothing herein, or in any of the further agreements contemplated herein, shall be binding upon the Railroad Commission of Texas until the Agreed Order has been duly presented to and approved by the Commissioners.

Nothing in this agreement affects the Debtors' liabilities, if any, to the Commission with respect to the related bankruptcy cases of NBI Services, Inc. (18-11125) or Red Water Resources, Inc. (18-11127), nor affect the rights of NBI Services, Inc. or Red Water Resources, Inc.

IN WITNESS WHEREOF, the Parties hereto have executed this Term Sheet as of the date set forth below.

W.O. OPERATING COMPAMY, LTD.

By: *[signature]*
Name: Richard J. Nichols
Title: President
Date: 12/14/18

SB ENERGY 1, LLC

By: _____
Name: Richard Sands
Title:   Authorized Representative
Date:

LARGE OPERATING, LLC

By: _____
Name: Richard Sands
Title:   Authorized Representative
Date:

THE RAILROAD COMMISSION OF TEXAS

By: *[signature]*
Name: Todd Headden
Title: Attorney for Railroad Commission of Texas

6

IN WITNESS WHEREOF, the Parties hereto have executed this Term Sheet as of the date set forth below.

W.O. OPERATING COMPAMY, LTD.

By: _____
Name:
Title:
Date:

SB ENERGY 1, LLC

By: _____
Name: Richard Sands
Title:  Member Manager
Date: 12/14/2018

LARGE OPERATING, LLC

By: _____
Name: Richard Sands
Title:  Member Manager
Date: 12/14/2018

THE RAILROAD COMMISSION OF TEXAS

By: _____
Name:
Title:

6

*Execution Version*

Exhibit A to Settlement Term Sheet
*Matter of Nichols Brothers, Inc., et al.*

Draft Affidavit to be submitted along with Railroad Commission of Texas
Form P-4 Certificate of Compliance and Transportation Authority

I, [Name], work with [Operator Name] in the capacity of [title] and am familiar with the [lease name] lease underlying this form submitted to the Railroad Commission to notify the commission of a change of operator. I certify to the Railroad Commission that as the intended operator for the above-mentioned lease, that the leaseholder, [Buyer], has a factually supported claim based upon a recognized legal theory to a continuing possessory right in a mineral estate, [including but not limited to] evidence of a currently valid oil and gas lease or a recorded deed conveying a fee interest in the mineral estate.

[Signature Block]

Exhibit B to Settlement Term Sheet
*Matter of Nichols Brothers, Inc., et al.*

Language to be included in any Sale order respecting
the leases to be sold by W.O. Operating Company.

"Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order."