IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| IN RE NICHOLS BROTHERS, ) | Case No. 18-11123-M |
| INC., et al.,[1] ) | Chapter 11 |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

### SECOND AMENDED MOTION TO SETTLE AND COMPROMISE CLAIMS BY AND AGAINST THE RAILROAD COMMISSION OF TEXAS AND NOTICE OF OPPORTUNITY FOR HEARING

W.O. Operating Company, Ltd. ("WO" or "Debtor"), by and through counsel, hereby requests that the Court approve a compromise and settlement with the Railroad Commission of Texas (the "Commission" or the "RRC") and SB Energy I, LLC ("Buyer") and Large Operating, LLC ("Operator"). As support therefore, the Debtor will show the Court the following:

**Jurisdiction**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 11 U.S.C. § 157(b)(2)(A) and (B).

**Background**

2. On June 1, 2018, the Debtor commenced a voluntary petition under Chapter 11 of the United States Bankruptcy Code. The Debtor's case was administratively consolidated under Case No. 19-11123-M of Nichols Brothers, Inc. Prior to filing, the Debtor was part of a diversified group focusing primarily on oil and gas operations. The Debtor's principal assets were located in

---

[1] The Debtors in these jointly administered cases are: NICHOLS BROTHERS, INC., Case No. 18-11123-TLM; NBI PROPERTIES, INC., Case No. 18-11124-M; NBI SERVICES, INC., Case No. 18-11125-M; LADDER COMPANIES, INC., Case No. 18-11126-M; RED WATER RESOURCES, INC., Case No. 18-11127-M; CANO PETRO OF NEW MEXICO, INC., Case No. 18-11128-M; and W.O. OPERATING COMPANY, LTD., Case No. 18-11129-M.

the panhandle of Texas and comprised of approximately 73 oil and gas leases with approximately 900 wells located thereon. The Debtor has not operated for some time based, in part, upon severance orders issued by the RRC.

3. Upon filing, the RRC took various actions in the Debtor's case, including but not limited to filing a motion to convert the Debtor's Chapter 11 case to one under Chapter 7, seeking to transfer the Debtor's case to the Northern District of Texas, and commencing an adversary action [Adv. No. 18-1041-M] asserting certain claims and relief against the Debtor. In the adversary complaint, the TRRC is seeking, among other things, to establish claims against the Debtor.

4. The Debtor vigorously defended against the actions of the RRC, including filing a motion to dismiss the adversary complaint, which is currently abated. The adversary case raises novel and difficult issues concerning the claims brought by the RRC against the Debtor. The Debtor sought the opportunity to sell its oil and gas properties to a third party.

5. On October 19, 2018, the Debtor entered into an asset purchase agreement ("APA"), as amended, with Buyer, which provided for a sale of substantially all of its assets, including the 73 oil and gas leases and associated wells located thereon.

6. On November 26, 2018, the Bankruptcy Court entered an *Order Approving Sale of Assets Outside of the Ordinary Course of Business, Free and Clear of Liens, Claims, and Encumbrances, and Approving Entry into and Consummation of Asset Purchase Agreement, all Pursuant to 11 U.S.C. § 363* [ECF No. 230] (the "Sale Order"). The Sale Order and APA incorporated the terms of the compromise among the Parties.

7. Debtor filed a Motion to Settle or Compromise on November 6, 2018 [ECF No. 216] which would have settled all matters between Debtor and the RRC. No objection was interposed to the original Motion to Settle or Compromise [ECF No. 216]. Due to a change in

circumstances, described below, that Motion to Settle [EFC No. 216] was amended and replaced by the Amended Motion to Settle [ECF No. 232].

8. On November 30, 2018, Buyer unilaterally notified WO and the RRC that it would not acquire the Fee -244- Lease, lease number 10-00106 ("Fee Lease"), and thus the Operator (as defined in the Amended Term Sheet) would not place the associated wells on its operator's bonds with the RRC. A result of this action is that WO has continued to own 122 unplugged wells on the Fee Lease, which represent approximately 13% of WO's initial 917 wells and reflects an estimated plugging liability of $2.6 million which was not assumed by Buyer or Operator, as originally agreed. This materially affected the total compromise and resolution of issues related to the removal of the obligations to plug and abandon these wells, which were resolved in the APA. In turn, the claim within the RRC's Adversary Proceeding (18-01041) seeking for Debtor to plug the inactive wells was no longer moot as to the 122 wells on the Fee Lease but remain moot as to the other leases covered in the APA.

9. The result of the Buyer's action was to leave the matters related to the Fee Lease (involving 122 wells) unresolved. Despite the remaining liability, WO waived the breach and proceeded to negotiate an Amended Term Sheet with SB Energy and the RRC, which allowed for the Buyer to complete the APA and Operator to file the necessary paperwork with the RRC to begin operating the transferred leases. This Court entered the order on the Amended Motion to Settle on January 11, 2019 [ECF No. 245] and the Buyer effectuated the Closing of the APA on or about January 11, 2019.

10. In accordance with the terms of the Amended Term Sheet, WO had 60 days to either sell the Fee Lease or move to dismiss its bankruptcy case. In February 2019, counsel for the Buyer and Operator advised WO and the RRC that it could take ownership of the Fee Lease after all, but

conditioned such ownership transfer on reaching an agreement with the RRC regarding the time frame to plug 13 identified wells. Thereafter, WO, the RRC, and Buyer/Operator commenced protracted negotiations. The RRC and the Buyer/Operator negotiated material changes which are more fully presented in the Supplement to Amended Settlement Agreement Term Sheet (the "Supplemental Term Sheet") which is attached hereto as Exhibit A, The Supplemental Term Sheet includes provisions stating that (i) the RRC agrees to a three year plugging schedule for the Operator to plug 13 identified wells; (ii) Buyer/Operator will obtain bonds ("Plugging Bonds") sufficient to cover the estimated cost of plugging the 13 wells and may reduce the Plugging Bonds annually by an amount equal to the estimated cost of plugging of the wells plugged in the prior year; and, (iii) will retain their Additional Financial Assurance bond of $2,000,000 for a period of two years after the Closing of the Fee Lease.

11. The Supplemental Term Sheet also resolves the outstanding contested matters between the Commission and WO, therefore the Commission agrees to dismiss the currently abated Motion to Convert [ECF No. 124] and Motion to Transfer [ECF No. 137] as well as the abated Adversary Proceeding No. 18-1041-M within five days of the Closing of the Fee Lease. The pending litigation in the Adversary action raises legal issues which are arguably not settled law in the Tenth Circuit and which the RRC has advised it would be required to litigate. WO will have disposed of most of its assets, and will have little or no unencumbered assets, and cannot afford the cost of litigation.

12. As part of the transfer of the Fee Lease, both the Debtor and representatives of SB Energy negotiated with the RRC concerning regulatory approval of the sale. As part of these negotiations, the Debtor and RRC settled and resolved all claims against the other.

**Settlement Terms**

13. The terms and conditions to which the Debtor and RRC have agreed to settle and compromise various claims as between the parties, and which approval is being sought by the Court, are set forth in the Supplemental Term Sheet which incorporates and supplements the previously approved Amended Term Sheet. The new material terms of the supplemental settlement and compromise are as follows:

(1) Upon Closing of the Fee Lease transfer, WO will be released from liability in connection with the Fee Lease;

(2) Buyer shall pay to WO the case sum of $18,987.60 which is intended to reimburse the WO estate for taxes incurred associated with the Fee Lease;

(3) Operator will have three years from the closing of the Fee Lease to plug 13 wells identified in Exhibit B of the Supplement to Amended Term Sheet. Buyer or Operator will post bonds to cover the estimated cost of plugging the wells and may reduce the amount of the bond annually based upon the estimated cost of plugging the wells actually plugged within the year prior to renewal as reflected in the plugging schedule;

(4) Buyer/Operator agrees to maintain the Additional Financial Assurance defined in Section 2.1(h) of the Amended Term Sheet for two years after the Closing of the Fee Lease; and

(5) Within five days of the Closing of the Fee Lease, the RRC will dismiss the abated contested motions and Adversary Proceeding No. 18-1041-M filed against Debtor by the RRC.

**Discussion**

14. Federal Rule of Bankruptcy Procedure 9019 authorizes courts to approve settlements that affect the bankruptcy estate. The approval or rejection of a settlement is left to the sound discretion of the court and is determined by the particular facts and circumstances of the proposed settlement. The phrase "sound discretion" denotes the absence of any hard and fast rule; indeed, it contemplates a decision giving due regard to what is right and equitable under the

5

particular circumstances and applicable law. *See generally Protective Committee for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).

15. Courts have adopted the following criteria to determine the acceptability of a proposed settlement under Bankruptcy Rule 9019:

> (1) The balance between the likelihood of success compared to the present and future benefits offered by settlement;
>
> (2) The prospect of complex and protracted litigation if settlement is not approved;
>
> (3) The expense, inconvenience, and delay necessary in attending the litigation (including the possibility that denial of settlement will cause depletion of assets);
>
> (4) The competency and experience of counsel who support settlement;
>
> (5) Other factors relevant to a full and fair assessment of the wisdom of the proposed settlement;
>
> (6) The extent to which settlement is the product of arms' length negotiation; and
>
> (7) The paramount consideration of creditors and other parties-in-interest, which requires whether the proposed settlement falls below the lowest point in a range of reasonableness.

*See generally American Employers' Ins. Co. v. King Resources Co.*, 556 F.2d 471 (10th Cir. 1977); *see also In re Kopexa Realty Venture Co.,* 213 B.R. 1020 (10th Cir. BAP 1997). The Debtor respectfully submits that the above-referenced settlement and compromise is fair and equitable and in the best interest of Debtor, its creditors, and parties-in-interest.

16. The Debtor submits that the terms of the proposed settlements meet the requirements established for Bankruptcy Rule 9019. The settlement will avoid costly and protracted litigation and will free funds to pay expenses and creditors, and the agreement of the

RRC to permit WO to transfer its remaining asset and the related liabilities, is expressly conditioned on these terms and the Supplemental Amended Term Sheet.

### NOTICE OF OPPORTUNITY FOR HEARING

**Your rights may be affected. You should read this document carefully and consult your attorney about your rights and the effect of this document.** If you do not want the Court to grant the requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Northern District of Oklahoma, 224 South Boulder, Tulsa, Oklahoma 74103 no later than 24 days from the date of filing of this request for relief. You should also serve a file-stamped copy of your response or objection on the undersigned movants' attorneys, and any party who is required to be served under applicable law, and file a certificate of service with the Court. If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice. **The 24-day period includes the three (3) days allowed for mailing provided for in Bankruptcy Rule 9006(f).**

WHEREFORE, the Debtor, the RRC, Buyer, and the Operator request that the Court approve the above-referenced settlement between the parties pursuant to Federal Rule of Bankruptcy Procedure 9019, that the order be deemed final upon entry, and any other relief that the Court deems reasonable and just under the facts of this bankruptcy case.

Respectfully submitted,

*/s/ Chad J. Kutmas*
Gary M. McDonald, OBA No. 5960
Chad J. Kutmas, OBA No. 19505
Mary E. Kindelt, OBA No. 21728
MCDONALD & METCAL, LLP
First Place Tower
15 E. Fifth Street, Suite 1400
Tulsa, OK 74103
(918) 430-3700
(918) 430-3770 (Fax)
gmcdonald@mmmsk.com
ckutmas@mmmsk.com
mkindelt@mmmsk.com

*Attorneys for the Debtor*

# EXHIBIT "A"

— *Matter of Nichols Brothers, Inc, et al.* —
SUPPLEMENT TO AMENDED SETTLEMENT AGREEMENT TERM SHEET

This Supplement (the "Supplement") to the Amended Term Sheet ("Amended Term Sheet") is being entered into between W.O. Operating Company, Ltd. ("W.O. Operating" or the "Debtor"), SB Energy 1, LLC, or its assignee ("Buyer"), and the Railroad Commission of Texas ("Commission" and collectively with W.O. Operating and the Buyer, the "Parties").

W.O. Operating is a debtor and debtor-in-possession in a Chapter 11 bankruptcy case being jointly administered in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Court") under the caption of *In re Nichols Brothers, Inc., et al.*, No. 18-11123-M ("Chapter 11 Case").

On November 6, 2018, W.O. Operating filed a motion to sell substantially all of its assets [ECF 213] (the "Sale Motion"). On November 26, the Court entered an order [ECF 230] (the "Sale Order") that authorizes the Debtor to sell substantially all of its assets to Buyer.

In connection with the Sale Motion, the Parties entered into the Settlement Agreement Term Sheet to settle the claims and disputes pending between W.O. Operating and the Commission in connection with assets being sold in the Sale Motion. On November 6, 2018, W. O. Operating filed a motion to approve the Settlement Agreement Term Sheet [ECF 216].

In connection with preparing for the closing of the sale, Buyer notified W.O. Operating and the Commission that Buyer could not provide Commission the Good Faith Claim Affidavit (defined below) with respect to the lease identified as "Fee -244-", lease number 10-00106 (the "Fee Lease"), and that the Operator could not place the associated wells on its bonds with the Commission. W.O. Operating confirmed to Buyer that it would waive conditions to closing such that Buyer can close notwithstanding that Buyer is not assuming the Fee Lease; provided that (i) W.O. Operating entered into an Amended Term Sheet with the Buyer and the Commission, (ii) the Bankruptcy Court approved the Amended Term Sheet and (iii) the Commission approved the Amended Term Sheet. Each of the foregoing conditions were satisfied.

On December 17, 2018, W.O. Operating filed a motion (the "Amended Settlement Motion") [ECF 232] that summarized the principal terms and material of the settlement of claims and disputes pending between W.O. Operating and the Commission and addressed the removal of the Fee Lease from the sale. On January 11, 2019, the Court entered an order [ECF 245] approving the Amended Settlement Motion.

On or about January 11, 2019, Buyer and W.O. Operating closed on the sale of the assets subject to the Sale Motion, except for the Fee Lease.

Following the sale, Buyer communicated with the royalty owner and the surface owner of the Fee Lease. Based on these communications, the Buyer has determined that it can provide the Good Faith Claim Affidavit with respect to the Fee Lease.

This Supplement supplements the Amended Term Sheet to address the transfer of the Fee Lease to the Buyer. This Supplement summarizes the principal terms and conditions required of Buyer and Large Operating, LLC, (the "Operator") to operate the Fee Lease. **All the terms of the Amended Term Sheet that are not expressly changed herein remain in full force and effect.**

Execution of this Term Sheet shall be binding on the Parties subject to approval 1) by the Court pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and 2) by the Commissioners of the Commission, as more fully discussed below.

## I.   Agreements Between W.O. Operating and Buyer

1.2   Subject to execution of this Supplement by all the parties and the approval of the Supplement by the Court, W.O. Operating confirms that it will take all reasonable and appropriate actions to transfer the Fee Lease to the Buyer and the Buyer confirms it will take all reasonable and appropriate actions to consummate the transfer proceeding. Buyer shall pay to W.O. Operating the cash sum of $18,987.60.

## II.   Agreements Between Buyer and the Commission

2.3   As part of the transfer of the Fee Lease, and as a condition of the Commission's approval of the same, Buyer and Commission will take the following actions:

   a. Buyer or Operator shall submit a dual-signature form P-4 Producer's Transportation Authority and Certificate of Compliance ("Form P-4") transfer of operator form for the Fee Lease in the name of the Operator. Buyer or Operator shall submit the P-4 transfer packets at least five days before the closing of the transfer.

   b. Given the unique facts and circumstances in this case, as part of the dual signature P-4 transfer packet, the Commission shall accept the Operator's affidavit as evidence of a "good-faith claim" to title, a copy of the proposed affidavit language is attached as Exhibit A (the "Good Faith Claim Affidavit"). The Commission is not challenging the validity of the Fee Lease. In the event that some third-party with standing desires to contest the "good-faith claim" to title, the Commission shall open a docket to be presided over by an Administrative Law Judge with the Commission's Hearings Division and the Operator will be required to supplement the evidence beyond the Good Faith Claim Affidavit to prove a good-faith claim to operate the Lease.

   c. Buyer and/or Operator must comply with all rules and regulations of the Commission. Buyer and/or Operator will remedy any existing severance issues within all applicable time periods as may be extended in writing by the Commission.

2

Buyer/Operator and the Commission agree that the following wells on the Fee Lease need to be plugged: The wells at issue on the Fee Lease are the following: 24, 49, 60, 66, 67, 108, 127, 133, 135, 159, 168, 173 and 181 (the "<u>Subject Wells</u>"). The Commission agrees to provide Buyer/Operator a period of three years after the transfer of the Subject Wells to Operator's Form P-5 (the date of the transfer, the "<u>Closing of the Fee Lease</u>") to plug these wells, provided that, Buyer/Operator will post financial assurance in the form of bond(s) with the Commission sufficient to cover the cost to plug the wells ("<u>Plugging Bonds</u>"). Buyer/Operator will name the Commission as the beneficiary of the Plugging Bonds, to be obtained in the amount of the estimated plugging costs ("Estimated Plugging Cost") of the wells as demonstrated in Exhibit B, attached hereto. Buyer/Operator will plug the thirteen Subject Wells in the following timeline, after the Closing of the Fee Lease:

    i. Year One: Four Subject Wells
   ii. Year Two: Five Subject Wells
  iii. Year Three: Four Subject Wells

Upon the annual renewal of the Plugging Bond, the amount of the Plugging Bond may be reduced in an amount that corresponds to the Estimated Plugging Costs of the Subject Wells plugged in the year prior to the renewal.

Breach of the plugging schedule for the Subject wells will allow the Commission to, in its own discretion, request the performance of the plugging of the wells, or demand payment from the bonding company for the Commission to then plug the wells.

d. Buyer/Operator will have six months following Closing of the Fee Lease to comply with W3-C surface requirements.

e. Buyer/Operator agrees to maintain the Additional Financial Assurance defined in Section 2.1(h) of the Amended Term Sheet for a period of two years after the Closing of the Fee Lease. For the avoidance of doubt, this will include the P-5 renewal application set to occur in December 2019 and December 2020. Commencing with the P-5 renewal application set to occur in December 2021, Buyer/Operator shall comply with Oil & Gas Statewide Rule 15 (16 Tex. Admin. Code 3.15) and may seek to utilize any Extension Options when requesting an plugging extension for inactive wells.

2.4    This Supplement will be incorporated into a separate Agreed Order among Buyer, the Operator, and the Commission to be submitted for Commissioner approval at a regularly scheduled Open Meeting unless the Commission otherwise approves prior to such scheduled Open Meeting. The Parties acknowledge that the Commission's approval is a condition to the Closing of the Fee Lease transfer contemplated herein.

3

### III. Agreements Between W.O. Operating and the Commission

3.1 In the event that the Bankruptcy Court approves this Supplement and Buyer meets each of the obligations required by the Commission under this Supplement, W.O. Operating and the Commission will settle and resolve all disputes between them as follows:

    c. Within five days of the Closing of the transfer of the Fee Lease, the Commission will dismiss the following with prejudice with each party to bear their own costs and expenses, including attorneys' fees:

        (i). Motion to Convert W.O. Operating's individual Chapter 11 case to one under Chapter 7 [ECF 124];

        (ii). Motion to transfer W.O. Operating's individual case to the Northern District of Texas [Docket No. 137]; and

        (iii). Adversary Proceeding No. 18-1041-M filed against W.O. Operating by the Commission.

3.2 The agreement contained in this Supplement between W.O. Operating and the Commission will be incorporated into a Rule 9019 Motion to settle and compromise and will be subject to approval by the Court in the Chapter 11 Case.

### Closing of the Fee Lease

The Parties shall coordinate the Closing of the Fee Lease to occur at the same time as the approval of the transfer of the dual-signature Form P-4s by the Commission. If Buyer/Operator does not complete any of the above-mentioned provisions (including thePlugging Bonds), the Commission will notify the Parties of any deficiencies no less than 48 hours in advance of the scheduled Closing. If Buyer or Operator do not submit satisfactory paperwork for the transfer of the Fee Lease, the Closing will not occur as scheduled until all such deficiencies are corrected.

### Miscellaneous

Notwithstanding any other provision of this Supplement, the settlement terms set forth herein shall be incorporated into a Settlement Agreement, and same will be reflected in an Agreed Order in form and substance suitable for presentation to the Commissioners of the Railroad Commission of Texas for approval. Nothing herein, or in any of the further agreements contemplated herein, shall be binding upon the Railroad Commission of Texas until the Agreed Order has been duly presented to and approved by the Commissioners.

Nothing in this agreement affects the Debtors' liabilities, if any, to the Commission with respect to the related bankruptcy cases of NBI Services, Inc. (18-11125) or Red Water Resources, Inc. (18-11127).

IN WITNESS WHEREOF, the Parties hereto have executed this Supplement as of the date set forth below.

W.O. OPERATING COMPANY, LTD.

By: _____
Name:
Title:
Date:


SB ENERGY 1, LLC

By: _____
Name: Richard Sands
Title: Authorized Representative
Date: 5/30/19


LARGE OPERATING, LLC

By: _____
Name: Richard Sands
Title: Authorized Representative
Date: 5/30/19


THE RAILROAD COMMISSION OF TEXAS

By: _____
Name:
Title:

5

IN WITNESS WHEREOF, the Parties hereto have executed this Supplement as of the date set forth below.

W.O. OPERATING COMPANY, LTD.

By: _____
Name:
Title:
Date:


SB ENERGY 1, LLC

By: _____
Name: Richard Sands
Title:  Authorized Representative
Date:


LARGE OPERATING, LLC

By: _____
Name: Richard Sands
Title:  Authorized Representative
Date:


THE RAILROAD COMMISSION OF TEXAS

By: _____
Name: Todd B. Headden
Title: Attorney for the Railroad Commission of Texas

5

IN WITNESS WHEREOF, the Parties hereto have executed this Supplement as of the date set forth below.

W.O. OPERATING COMPANY, LTD.

By: *(signature)*
Name: V. Bill Koehler
Title: Chief Restructuring Officer
Date: 5-31-19

SB ENERGY 1, LLC

By: _____
Name: Richard Sands
Title: Authorized Representative
Date:

LARGE OPERATING, LLC

By: _____
Name: Richard Sands
Title: Authorized Representative
Date:

THE RAILROAD COMMISSION OF TEXAS

By: _____
Name:
Title:

5

*Execution Version*

Exhibit A to Supplement to Settlement Term Sheet
*Matter of Nichols Brothers, Inc., et al.*

Draft Affidavit to be submitted along with Railroad Commission of Texas
Form P-4 Certificate of Compliance and Transportation Authority

I, [Name], work with [Operator Name] in the capacity of [title] and am familiar with the [lease name] lease underlying this form submitted to the Railroad Commission to notify the commission of a change of operator. I certify to the Railroad Commission that as the intended operator for the above-mentioned lease, that the leaseholder, [Buyer], has a factually supported claim based upon a recognized legal theory to a continuing possessory right in a mineral estate, [including but not limited to] evidence of a currently valid oil and gas lease or a recorded deed conveying a fee interest in the mineral estate.

[Signature Block]

*Execution Version*

Exhibit B to Supplement to Settlement Term Sheet
*Matter of Nichols Brothers, Inc., et al.*

# ESTIMATED COST OF PLUGGING THE SUBJECT WELLS

| Well No. | Depth of well[1] | Estimated cost of plugging per foot | Estimated cost of plugging well |
|---|---|---|---|
| 24 | 3,903.49 Feet | $5.44 | $21,235 |
| 49 | 3,903.49 Feet | $5.44 | $21,235 |
| 60 | 3,903.49 Feet | $5.44 | $21,235 |
| 66 | 3,903.49 Feet | $5.44 | $21,235 |
| 67 | 3,903.49 Feet | $5.44 | $21,235 |
| 108 | 3,903.49 Feet | $5.44 | $21,235 |
| 127 | 3,903.49 Feet | $5.44 | $21,235 |
| 133 | 3,903.49 Feet | $5.44 | $21,235 |
| 135 | 3,903.49 Feet | $5.44 | $21,235 |
| 159 | 3,903.49 Feet | $5.44 | $21,235 |
| 168 | 3,903.49 Feet | $5.44 | $21,235 |
| 173 | 3,903.49 Feet | $5.44 | $21,235 |
| 181 | 3,903.49 Feet | $5.44 | $21,235 |
| Total | 50,745 Feet | $5.44 | $276,055 |

---

[1] Due to incomplete records provided to the Railroad Commission, each well was assigned a default